Case No. 16-1133, Duke Energy Corporation et al. petitioners v. Federal Energy Regulatory Commission Mr. Fitzgerald for the petitioners, Ms. Rylander for the respondent, and Mr. Mays for the intervener Good morning. Good morning. May it please the Court, Matt Fitzgerald for Duke Energy. This is not a typical FERC case. This is a contract interpretation case that centers on an indemnity provision. There is no deference in the interpretation here. There is only an unambiguous contract term. So the background here is that Duke did everything right. There is no allegation of negligence. There is no allegation of bad faith. And PJM, though it's on the other side of this case, clearly would want Duke to do exactly the same thing under these circumstances as it did here. So it starts, of course, with the polar vortex, which is an unprecedented cold weather emergency. And under those emergency circumstances Does it have to be unprecedented given your reading of the tariff indemnification provision? It does not have to be unprecedented, no, Your Honor. But it's important that it's an emergency circumstance because in the declared emergency, that triggers PJM's powers to direct the operations of market participants, which includes Duke. So on the morning of Why was this more directive than every day they say, hey, here's what we need bid in? So what they do on their This was just all hands on deck, but it's the same process fundamentally. No, Your Honor. So it's totally different. And the difference is what PJM does every day is essentially say, turn on it. It clears the market and it says, turn on and turn off when it needs the energy put into the grid. What it did on this day that's so unique is it specifically ordered the purchase of natural gas by Duke. And that's not something that PJM does. Well, FERC, FERC, FERC found that it didn't. Well, Your Honor, there's no FERC's right about that. Do you agree that you lose? Yes. Yeah. Okay. So why don't you focus on that? Sure. So the key here, we have these communications, these phone calls in the record, Your Honor, at 142 to 146, I believe. And there are three phone calls in rapid succession between Duke and PJM. And the key is this statement that the securing of gas is not economic today. Every day when Duke secures gas, it is up to Duke and it is an economic decision by Duke whether to buy gas, when to buy gas. The whole gas buying process is normally up to Duke and it's absolutely economic and everybody understands that. And so when on this day they say, you know, we advise you to secure gas today. This is not economic. This is a reliability issue. That's the real signal to Duke. This is a special, this is something that we must immediately obey from PJM. And so that's what they did. And so there's only one affidavit in the record about this. We have the phone calls and then we have the affidavit of Mr. Cecil from Duke. And he explains that that's what happened. And that's what he understood. He says, quote, I called Mr. Marr to confirm that PJM was instructing Duke to secure gas without regard to economics. He confirmed that my understanding of the situation was accurate. And that's at page 134 of the record. You have competing views of what the implications of those phone calls were. Is that a type of almost factual determination that we ask just whether there is substantial evidence to support FERC's conclusion? Or is that a legal ruling? If there is ultimately a, if there were a clear factual finding by FERC, these conversations did not mean go out and buy gas. Then that would be subject to the substantial evidence standard. And it's in our brief that way because we have to protect against the possibility that FERC's orders will be read that way. But really, when we look at FERC's orders, what they're actually doing, I believe, is they're actually interpreting the tariff. And so what they say several times is, we find the PJM indemnification provision should not be interpreted to guarantee reimbursement. That's at page 29 of the joint appendix. They say at page 31, this is not a directive within the meaning of the indemnification provision. So there are snippets of FERC's orders that seem to lean towards some factual finding, but I don't think that's the best way to read their orders. But in any case, we address it in our brief because we have to take that chance. So the scenario here, so what FERC actually did say here is a couple of things. First, they said, this is not the right kind of loss under this tariff provision. But the provision refers to any and all losses, any and all damages, losses, claims, and all other obligations to third parties. There's no textual... That's got no textual limitation for polar vortexes. That could happen. You could do this every day. It could happen every day under... It's a broad term, yes, Your Honor. But it doesn't happen every day, and the key to this not happening every day... Don't lose some money other days? Do we lose money other days? Sure, it can happen. So all those would be compensable under your reading? No, no, not at all, Your Honor. So normally speaking, on ordinary days, on normal days, most virtually all days, PJM's instructions to Duke are turn on and turn off. And it is the purchase of fuel under those circumstances is still up to Duke. It's still in Duke's judgment. So ordinary... Is that the directive? It could be, Your Honor. Yes, the tariff suggests that it could be. Well, then doesn't the directive to turn on mean you better have some gas when you turn it on? No, Your Honor, because a couple of reasons. So first of all, the ordinary... So it's a staged series of communications where first it clears its bid into the market, and then it clears the market. So that's when PJM essentially says, looks like we're going to need you. And then there is a notice given in the amount of time that Duke has asked for before the unit is actually needing to run on this turn on, turn off signal. So as these communications happen, it remains up to Duke whether to buy fuel, when to buy fuel, how to arrange its affairs to be ready to turn on like that. And so what's really unique about this case and really important is that PJM actually steps out of its lane and it says, we need you to buy fuel, because that's what PJM never does. When Duke buys fuel in its own judgment, then it's on Duke whether it pays for it. I guess I don't understand why it is that PJM isn't also telling Duke Energy to buy fuel when it says turn on. What's the distinction here? Well I guess it's difficult because it's a staged series of communications. So the turn on signal is a dispatch signal. It's an electronic thing that happens every five minutes. And it is a part in time and space and the judgment of Duke from the process of buying fuel. So I mean keep in mind, this provision applies to all of the generation owners in PJM. There are some of these that are run by coal. There are some that are run by nuclear, which have totally different fuel type situations. So it isn't that, put it this way, I wouldn't say that in response to the electronic dispatch signal turn on, that it is implementing or complying with that order for Duke, you know, 16 hours later or a day earlier to have made a decision to purchase fuel or not. So another textual question before you chime us up and that is, it talks about, this is all indemnification by a transmission customer. So this doesn't sound like it's supposed to be a PJM-Duke relationship, which is governed by other things under the contract. Right, the indemnification is ultimately by the transmission customer. And the transmission customer is probably the company that sends you your personal electric bill. Is Duke just going to have to pay this indemnification? Ultimately, the rate payers, the transmission customers would collect it from the rate payers, yes, your honor. And so, but the reason PJM settlement in particular is sued here is that PJM settlement is the entity that exists to connect generation owners like Duke to transmission customers. I get that, but the tariff provision seems to think the transmission customer that does the indemnification here is distinct from PJM settlement or PJM is from a transmission provider and yet you're saying they're the ones that got to get you the indemnification and they can figure out on their own how to get themselves repaid. Well, by figure out on their own, they would be billing the transmission customer for this. The money will come from the transmission customer and then in the long run from the rate payers, presumably. And that's how, when the transmission customer owes something, the way that a generation owner gets money from a transmission customer is to go through PJM settlement. And you can see FERC's order didn't, I believe that's an argument made by the interveners, not one that's in FERC's order. So FERC, it seems, doesn't have a problem with going after PJM settlement as a way to get money from the transmission customer. That is a proper path. So if I may, I'd like to save the remainder of my time. Okay. Thank you. Thank you. Good morning. May it please the Court, Elizabeth Rylander for the Commission. I'd like to start out by agreeing with Duke's counsel on a couple of important points. First, that Duke did do everything right here. Duke was obligated to be available to PJM on January 28th under the terms of the tariff and its obligations as a generation capacity resource. Duke purchased gas and made itself available. Second thing is that counsel has conceded that if PJM did not order Duke to purchase gas, then regardless of one's interpretation of Tariff Section 10.3, Duke would not prevail here. The Commission did, in fact, find that there was no directive from PJM to purchase gas. Can I ask real quick, do you agree with their reading of customer as well? So that's not a problem with their interpretation of the tariff. Their reading of transmission customer, Your Honor? For purposes of the indemnification provision. The Commission did not reach that issue because it found that tariff provision as a whole did not apply. And it focused principally on this question of whether there was a directive under the tariff. And so I'm not able to agree. I'm just trying to understand then, so if just hypothetically there were a disagreement with the Commission's decision as to directive, there would have to be a remand to address the customer issue? Or, in fact, is that not something that the Commission thinks is a barrier? Your Honor, if I could be sure that I'm following you correctly. Just assume. Okay. Just an assumption question. No, no. So I disagree on directive. We disagree on directive. So if the court were to find that there was a directive, then you want to know what happens in terms of the reading of customer. The Commission did not parse the word, the term transmission customer. It is defined in the tariff. But what the Commission then said, working backwards, that this provision isn't applicable legally because it doesn't, because this is part of a larger tariff and it does not apply to the situation that Duke finds itself in. Then, factually, the Commission also responded to Duke's arguments concerning the directive and said there was no directive here. I don't, I would not say the Commission made a particular representation as to what transmission customer means. Just finishing up. To go back to the finding of directive, why is this not a directive? Why it's not a directive, Your Honor? It is not a directive for a couple of reasons. The first one is that Duke is obliged, as a generation capacity resource, to be available to PJM every day. It must come up with some way to be able to turn its generation on and turn it off as instructed. Is that 100 percent? They have to be ready 100 percent? Yes, Your Honor. That's the contract requirement. I believe there's an exception for forced outages, but there's no allegation that there was an exception that was applicable here. So given that obligation, why would there ever be an order to buy gas, to buy fuel? There never would be, Your Honor. There would be no need. Yeah, that's what I thought. What's the purpose of this exchange? Why did PJM say, this isn't economics, do it? Mm-hmm. So what Duke describes in its opening briefs is that it's able to, in some cases, to time the purchase of gas and to time its availability, which Duke's counsel can explain this more clearly than me, but I imagine that would be to take advantage of the pipeline service as Duke has contracted for it, or of prices as they fluctuate during the day. So, but what happened on the morning of January 27th, which is a day prior to the emergency in Japan... So excuse me for interrupting here, but do you read all of these statements? I'm looking at the transcript of these conversations. All of these conversations between these two people, things like, we want all units available for tomorrow. Yes. He goes on and on. Do you view this, does FERC view all of this as just a reminder that it has an obligation to do this already? Yes, Your Honor. In other words, it's going to be really cold tomorrow. You better have everything going. Yes, Your Honor. I would view it that way. That's all this is? Yes. So when they say, so when he says, we want all units available tomorrow, if you can secure gas, we would advise you to secure gas for your units. FERC is saying that you just, you're obligated to have these units going, so you better get gas, right? Correct, Your Honor. PJM describes in its, I'm sorry, Duke describes in its opening brief some constraints in the pipeline. What would a directive look like if this isn't a directive? Give me an example of a directive. A, there's a reliability directive which has a specific, which has a specific meaning, and I believe that has to be, that has to be identified as a reliability directive, because that is pursuant to a separate set of rules. But I would, I would look for PJM more informally to use a word that isn't advised. I would look for PJM to say, we want you to buy gas. We instruct you to buy gas. We direct you to buy gas. What PJM said was, you know, if, you know, if you can get gas, we would, we think you're probably going to need it. We expect to, we expect to need you, but we cannot guarantee that you're going to be on. So Duke here took a calculated risk. Type of statement they would, that was a non-ordinary type of statement, was it not? There were, and when they say this is not an economic issue, you, you, you, Commission finds support in that, correct? They just say, look, this has nothing to do with money. You have a reliability obligation. So if I could take your Honor's question. Is that what that means? If I could take your Honor's questions together. Judge Tatel, I do think on an average day when it's not this cold and there are more, there are more generic resources available, PJM is, PJM and Duke are both able to consider the economics of a dispatch decision more, the economics come into play more so than they do here. I see. Getting to Judge Millett's question. I get it. Okay. This, this is unusual because there is so little capacity available. PJM says we're going to need it all. It doesn't matter what it costs. That is not a normal case. And if that was a normal case, we would certainly have had this, had a case something like this in the past. So what would be a directive? What would be a directive? I think, so again, there's, there's a NERC reliability directive which is made pursuant to NERC is the North American Electric Reliability Corporation. That is, that requires, those are specific instructions and PJM has denied that it issued a special reliability directive here. I'm, I'm not entirely sure what it would look like. But if PJM was just calling Duke to give it an instruction other than turn on, turn off, I would look for it to say, we want you to buy gas. We instruct you to buy gas. We direct you to buy gas. Something like that. This is pretty close to we instruct you to buy gas. Respectfully, Your Honor, I, I disagree. This is a, this is a tariff. The, the obligation for generation capacity resource to be available is stated in the tariff. It's there every day. And the calls between Duke and PJM. Yeah, but just be ready now. Buy gas now. I mean, maybe, it's usually either buy gas or start burning furniture. You're going to have to give us this, this power. It's not even necessarily buy gas now, Your Honor, because again, the emergency situation PJM was anticipating is at least 24 hours away. The reliability, I'm sorry, the emergency procedures broadcast was issued on the morning of January 27th for the day and evening periods of January 28th. And PJM states in the record. I don't get what the timing has to do with whether it's a directive. I mean, the vortex went on for a few, a few days and they, they got a plan ahead when they see something really, really, really bad coming weather-wise. And they said this is exceptional. Your Honor, I would direct your, direct your attention to the paragraph 24 of the initial order, which is on J8, page 13. PJM says that it wouldn't give a reliability directive 38 to 40 hours, 36 to 48 hours in advance. And if there was any such directive, it would have informed Duke that PJM needed to shed load. Shedding load means, is more commonly known as a brownout, dropping, dropping load to match the amount of generation there is. PJM says it just wouldn't have done that. Okay, great. Thank you very much. We'll have, we'll hear from the intervener. Thank you. As I'm new at this, I guess I'll be the only one saying, may it please the Court. My name is Jeffrey Mays, General Counsel for Monitoring Analytics, LLC, Independent Market Monitor for PJM. And I want to explain why no kind of equitable relief is appropriate in this case. Duke seeks an expansive interpretation of this indemnity provision, primarily based on arguments about bad weather and about statements from PJM. And I see those mainly as equitable arguments. Fairness requires that the request be denied. PJM markets have been restructured for competition, consistent with a lot of your earlier questions here. Regulation through competition is consistent with the law and economics principle that risk should be assigned to the party most able to manage them. Suppliers make money when they manage full procurement well. Suppliers lose money when they do not manage full procurement well. Suppliers who do not manage full procurement well lose out the competitors who do. And so Duke would not offer to share. I think a lot of your questions were going to this earlier. Duke is not offering to share the benefits of when it makes favorable gas purchases. Why would it think that it could come to customers and ask for compensation when it makes less favorable gas purchases? Suppliers can take a lot of money. Because the tariff says they can do it if they incur losses from complying with the directive. That's why. Right? Oh, I disagree. I don't think it says that at all. One is I don't think they received any directive. They appointed to no provision that authorizes PGM to direct Duke to buy gas. Duke did not believe that PGM had that authority. Duke did not. After it received that phone call that it characterized as a directive, it did not in fact buy gas. It waited. During that time, the price of gas rose significantly. Oh, about half of the losses or so can be contributed. Well, the directive was be ready tomorrow. What they do between the phone call and tomorrow is up to them. Well, what they initially received was a maximum generation emergency alert. And that is not that uncommon. In the period 2014 to the half of 2015, there were about 10 such maximum generation alerts issued by PGM. This was one of them. And so when that was issued, Duke apparently had done an analysis saying it did not expect that it was going to need gas tomorrow. It asked PGM why. It received a differing forecast from PGM. And it was reminded about reliability. And that's the key concern that PGM dispatchers have is they're looking at the weather tomorrow. This PGM dispatcher thinks tomorrow is going to be a bad day. And he's concerned about reliability. He's not authorized to direct Duke to purchase gas. I don't think anyone believes that a PGM dispatcher is authorized to order. It doesn't do anything like that. There's no authority in the tariff for that. So the claim that there was a directive in the sense of that PGM can order Duke to buy gas is false. Thank you very much. And so we talked a little bit about the reliability obligations. Excuse me. You're on your time. We have your argument. Thank you very much. Mr. Fitzgerald, I'll give you back two minutes. I sort of think what you're reading of the tariff includes, again, not just the cost of gas, but any other operational costs you have that day. No, Your Honor, because the directive that was given to us was to secure gas. So everything else that is ordinarily up to Duke and remained up to Duke on that day to make us ready to operate. It wasn't to secure gas and be ready to operate in 1-0-7, was it? Your Honor, could you just say once more, pointing to the actual language, what's your best evidence that you were directed to buy gas, keeping in mind that our standard here is we're reviewing FERC's decision for substantial evidence, right? Yes, Your Honor. You have to convince us that there was not substantial evidence to support FERC's decision that you were not given such an order. So what's the best? What's your best evidence for that? Several things, Your Honor. So first- No, I'm just asking for the best one. Okay. The best one is either going to be at page 143 of the record, the second of the three phone conversations, the paragraph where Mr. Marr says, if he's not securing gas based on economics, this is not an economic decision. We want all units available. If he doesn't like that, he can call my manager. And then- What's the other one? And then the other one is the affidavit filed by Mr. Cecil, who is the Duke employee here, which is the sole affidavit in the record of this case about this phone conversation and what these guys actually meant to be communicating and how he understood it at that time. The third one may be a statement made by PJM, which is in the record at 191, and that's where they said, PJM agrees Duke was reasonable in relying on its communications with PJM dispatch, and in good faith, made arrangements to secure gas. Okay, thanks. So, just- To go back to my question, so that was, so all units must be available, which sounds to me like more than just get the gas. You better have people and other things ready to go, too. Well, so available is really not the central word here, Your Honor. The available in the tariff sense is available capacity. And what that really means is, so put it this way. Duke is available in the tariff sense. If it says we need 20 hours notice and we don't have any fuel, we'll take the 20 hours to get the fuel that we may need. But Duke is perfectly available and perfectly within its rights under the tariff to say, great, we're available. We put 20 hours notice on all of this generation, so if you want us, that gives us plenty of time to get the fuel during that time. And of course, had that happened, it would have worked out perfectly. And so, that is not what they're really talking about. These three phone conversations are talking about buying gas. And buying gas, if you're not securing gas based on economics, which essentially means if you're not securing gas because in your judgment- Remind me, who initiated the phone calls? The first phone call was from Duke to PJM. And so, but then PJM calls back, Your Honor, several minutes later and says, essentially says it much more clearly at that point. And then Duke, because he hadn't gotten the same fellow on the phone, called back to confirm again. But so, all of these happened within about six minutes on this morning, just a few minutes after the maximum generation. And who was the first one to ask the question about the need to secure gas? So, the first one to ask the question was Duke. Yes, Your Honor. And a key order comes in the second conversation, I would say, which is when PJM calls back to say, it's essentially like they hang up a couple, just two minutes goes by and he says, you know what? I'm going to call, I'm going to call them back because I'm not sure they're understanding what's going on here. I'm going to tell them it's not an economic decision today, even though every day it's economic. Every day it's up to Duke and it's economic. And Duke has allowed these long lead times, but that's not what they want. I think we have your argument. Thank you very much. The case is submitted.
judges: Tatel, Griffith, Millett